HEANEY, Circuit Judge,
dissenting.
I respectfully dissent in part. There is more than sufficient evidence of the corrections employees’ deliberate indifference to James Alberson’s ongoing serious health issues to require a trial. Thus, summary judgment was inappropriate and the matter should be remanded. Although the present record does not directly link James’s death to the corrections employees’ indifference, it clearly shows that he suffered great pain prior to his death because the corrections employees denied him appropriate access to medical treatment.
Corrections officials are obligated, under the Eighth Amendment’s prohibition of cruel and unusual punishment, to provide inmates with proper medical care. Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir.1997). To show a constitutional violation, Alberson must show “(1) that [James] suffered objectively serious medical needs and (2) that the prison officials knew of but deliberately disregarded those needs.” Id. at 1239. “Whether a prison official had the requisite knowledge of substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence..., and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.” Farmer v. Brennan, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
The corrections employees’ actions and “callous comments” illustrate a culture of deliberate indifference at the Wrightville Unit. See Dulany, 132 F.3d at 1244 (noting lack of callous comments or actions to support its conclusion that the prison officials were not deliberately indifferent). The corrections employees’ minimal and dismissive response to the decedent’s condition was clearly suspect. The record reveals that James had to submit a num *767 ber of medical requests before receiving medical attention and that his mother made several calls to prison officials, who consistently discounted the complaints.
On July 31, 2003, while in county custody, James developed an ear infection that eventually resulted in hearing loss. At the time of his death, James was still suffering from the infection, and the corrections officials had not yet provided him with a hearing aid. From August 8 to August 29, 2003, James filed at least ten medical service requests complaining of hearing loss, heartburn, and extreme pain in his right shoulder, arm, and wrist. He received no medical attention until August 29, 2003. From August 2003 to November 2003, James’s mother called Kay Howell at least thirty times complaining about her son’s condition and requesting that he receive medical treatment. In response, Howell, apparently without verifying James’s medical condition, told Alberson that James was “faking it.”
From August 30 through September 24, 2003, James submitted at least four medical service requests complaining of heavy pain in his ears, head, throat and teeth, and an infected spider bite on his knee. He was not seen until September 24. In late September 2003, James’s mother called John Byus who, again apparently without verification, told James’s mother that James was “faking it.”
On October 12, 2003, James submitted a medical request complaining of severe headaches. He was not admitted to the infirmary until fifteen days later, on October 27. He was released on October 29. That same month, James’s mother called Larry Norris’s office to complain about the denial of medical treatment. She was told that Norris was not available and transferred to another person who told her that there was nothing wrong with James.
On November 3, James submitted a medical service request complaining of a constant cough, diarrhea, and aching pain in his body that affected his mobility. He was not seen until four days later on November 7 when he submitted an additional medical service request. On November 9, James’s mother visited him, and he was visibly distressed and walking with a limp. Later that night, James called her pleading for her to help him get some medical attention. She called the Wrightsville Unit requesting that someone check on him. She spoke with Lieutenant Tillman, who worked in the diagnostic hospital, and requested that James be examined and hospitalized. Tillman told her that only Byus could order James taken to the hospital and refused to disturb Byus at home. He then also told her that James was “faking it.” Two days later, James was seen by Dr. Branch, who diagnosed him as having a chronic cough and persistent sore throat. On November 14, 2003, James was spitting up blood and wheezing in both lungs. Although an x-ray had been ordered days before, it had not yet been performed. James was finally admitted to the infirmary on November 14, but treated only with Tylenol # 3. On November 15, 2003, James was still coughing and spitting up blood. He was diagnosed with pneumonia and transferred to Southwest Hospital where he was placed on a mechanical ventilator. At this point James had developed acute renal failure. On November 16, 2003, James was transferred to Jefferson Regional Medical Center, placed on ventilator support, and given dialysis. On November 19, 2003, James passed away.
To receive medical attention, James was required to submit numerous medical requests. When his mother pleaded with corrections employees to check on James’s condition, her concerns were met with the callous response, without verification, that James was “faking it.” There is sufficient evidence that the corrections employees were aware that James was suffering from *768 serious ongoing health issues, and yet they were deliberately indifferent to his plight. Dulany, 132 F.3d at 1239. Alberson testified that James was visibly distressed on November 9, and both James and his mother notified prison officials about James’s declining health condition. According to the record, James’s condition was “so obvious that even a layperson would easily recognize the necessity for a doctor’s attention.” Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir.2006). The corrections employees’ continuing statement that James was “faking it” evidences a “deliberate inaction [by the corrections employees] amounting to callousness.” See Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir.1998) (per curiam). The fact that James was not given a full and complete physical, though not sufficient on its own, should be considered in determining whether he was deliberately denied proper medical treatment. The rapid decline in James’s health condition during his confinement could convince a jury to determine that commonsense would have necessitated a thorough medical exam. There is sufficient evidence in the record for a jury to hold that the corrections employees were deliberately indifferent to James’s serious ongoing medical conditions. Thus, a remand for trial is essential.